## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7176 | **DATE** | 7/16/2004 |
| **CASE TITLE** | MICHAEL J. GOODLOE,et al vs. NATL' WHOLESALE CO.,et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the Court dismisses all of the federal claims (Counts I-VIII and XV-XVII). The parties are requested to file briefs concerning the propriety of this Court's continuing jurisdiction within 21 days of the date of this order (8/6/04). Furthermore, should Plaintiff choose, he is free to file an amended complaint reasserting any federal claims. Such an amended complaint also should be filed within 21 days of the date of this order (8/6/04). STATUS HEARING SET FOR 8/10/04 AT 10:30A.M.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | **Document Number** |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | JUL 1 9 2004 | |
| | Notified counsel by telephone. | | | | date docketed | 22 |
| ✓ | Docketing to mail notices. | | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | | |
| | Copy to judge/magistrate judge. | | | | date mailed notice | |
| | TBK | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. GOODLOE | ) | |
| d/b/a GTM-U.PEP CLUB, | ) | |
| | ) | Case No. 03 C 7176 |
| Plaintiff, | ) | |
| | ) | Judge Mark Filip |
| v. | ) | |
| | ) | |
| NATIONAL WHOLESALE COMPANY, | ) | |
| INC., E-COMMERCE EXCHANGE, INC., | ) | |
| MINOTOLA NATIONAL BANK, and | ) | |
| AXIN FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**
JUL 1 9 2004

MEMORANDUM OPINION AND ORDER

Plaintiff Michael Goodloe ("Goodloe" or "Plaintiff"), proceeding *pro se*, has sued

National Wholesale Company, Inc. ("NWC"), E-Commerce Exchange, Inc. ("ECX"),

Minotola National Bank ("Minotola"), and Axin Financial Services, Inc. ("Axin")

(collectively "Defendants") regarding Goodloe's lease of NWC, ECX, and Minotola

services from Axin. Goodloe leased the "Business Executive Package," a collection of

business services including a consumer electronics dealership and order processing

services, and also contracted for an OEM computer dealership, a dealership allowing

retail customers to order certain computers through Goodloe.

Plaintiff's Complaint advances a variety of claims under federal and state law,

including many claims that are facially insubstantial and frivolous. Although the

Complaint is often unclear concerning damages, it appears that Plaintiff at most has paid

several hundred dollars concerning the two leases in dispute (it most likely was less than

$200), and that the total amount of money due under those leases was some six thousand

22

dollars. (Plaintiff quickly closed bank accounts that were to be automatically debited for the lease payments, and it appears clear that no further monies beyond the initial payments have been collected.) Plaintiff nonetheless appears to claim, at a minimum, thirteen million dollars in damages, although the Complaint may actually allege damages millions of dollars in excess of that amount.

Goodloe asserts the following claims: Counts I-II allege violations of the Sherman Act, Counts III-V allege violations of the Robinson-Patman Act, Count VI alleges violation of the Americans with Disabilities Act, Count VII alleges violation of the Lanham Act, Count VIII alleges violation of the Federal Trade Commission Act, Count IX alleges violation of the Illinois Credit Agreements Act, Count X alleges violation of the Illinois Deceptive Practices Act, Count XI alleges an "unconscionable lease infringement" under the Illinois Uniform Commercial Code, Count XII alleges violation of the Illinois Business Opportunity Sales Law, Count XIII alleges violation of the Illinois Slander and Libel Act, Count XIV alleges violation of the Illinois Electronic Commerce Security Act, Count XV alleges violation of the Truth in Lending Act, Count XVI alleges violation of the Fair Debt Collection Practices Act, and Count XVII alleges violation of the Racketeer Influenced Corrupt Organization Act ("RICO").

Defendants moved to dismiss the complaint in its entirety with prejudice for failure to state a claim upon which relief may be granted pursuant to Fed. R .Civ. P. 12(b)(6). Plaintiff did not file a response to this motion, thereby waiving his right to do so under Local Rule 78.3.

For the reasons set forth below, the motion to dismiss is granted as to all federal claims. The parties are also invited to brief the question of why the state law claims

should not be dismissed without prejudice (so that Plaintiff may pursue them, if he chooses, in state court) because there is no plausible basis by which Plaintiff could recover in excess of the jurisdictional amount of $75,000.

<u>Background Facts</u>

Plaintiff originally filed this suit in October 2003 and the case was assigned to the Honorable Charles R. Norgle. In March 2004, the case was transferred to this Court.

As Defendants have pointed out (D.E. 4 at 4-5), Goodloe has an extensive history of failed federal litigation, including cases dismissed *sua sponte* pursuant to 28 U.S.C. § 1915. For example, in 2000, Plaintiff filed *Goodloe v. Illinois Deparment of Corrections*, 00-CV-681 (N.D. Ill.), in which the complaint was dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B), with the dismissal counting against Plaintiff as one of the three "strikes" allowed under 28 U.S.C. § 1915(g). In 2001, Plaintiff filed *Goodloe v. Equip for Equality*, 01-CV-50193 (N.D. Ill.); that suit also was dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B), with Judge Reinhart specifying that the dismissal counted as Plaintiff's second strike under 28 U.S.C. § 1915(g). Prior to these two suits, Plaintiff filed *Goodloe v. Tucker*, 97-CV-626 (S.D. Ill.), in which Plaintiff sued the Illinois Department of Corrections and 164 individuals. The court struck Goodloe's complaint *sua sponte* for failure to comply with Local Rule 8 and granted thirty days to amend. When Goodloe failed to file a conforming complaint, the court entered judgment in favor of the defendants. In *Goodloe v. Illinois Department of Corrections*, 93-CV-4229 (N.D. Ill.), Plaintiff sued the Illinois Department of Corrections and seven individuals. That suit was dismissed with leave to file an amended complaint, which Goodloe never did. Finally, in *Goodloe v. Peters*, 92-CV-1340 (C.D. Ill.), Plaintiff brought a § 1983 claim

against thirteen individuals. That suit was dismissed when the district court granted an uncontested motion for summary judgment of the defendants.

Defendants also note that Plaintiff has in this case failed to respond to their motion to dismiss. As a result, Defendants invite the Court to grant the motion, as it is "unopposed." (D.E. 21 at 1.) Although the Court will not grant the motion simply because it is unopposed, the Court agrees that the claims discussed below substantively fail.

<u>The Complaint</u>

Plaintiff's Complaint contains extensive amounts of "legalese" that often clouds things more than it clarifies. Nonetheless, reading the Complaint generously, consistent with Goodloe's *pro se* status, it appears that Plaintiff alleges the following facts.

In summary, during October 2001, Goodloe received a letter from NWC that invited Plaintiff to represent NWC in the sale of consumer electronic goods. (Compl. ¶ 7; Compl. Ex. 1.A.) Goodloe contacted NWC after reading the literature and spoke with an unknown sales representative about obtaining the "NWC Business Executive Package." (Compl. ¶ 8.) At that time, Goodloe disclosed to the representative that he suffers from schizophrenia. (*Id.*) Upon hearing this, the NWC representative allegedly said that, due to Goodloe's mental illness, he was not sure whether Goodloe could lease with the company. (*Id.*)

Later in October, 2001, Goodloe was contacted by an NWC sales representative who informed Goodloe that he would have to lease the Business Executive Package through NWC's partner—Axin—because of his limited income and schizophrenia. (Compl. ¶ 9.) Goodloe alleges that he indicated to the representative that he was going to

4

execute a lease from a website that called for 24 monthly payments of $24.95, but that the sales representative said he would send other contracts. (Compl. ¶¶ 13-14.) These contracts allegedly extended the lease term from 24 to 36 months and increased the monthly lease payment from $24.95 to $32.95. (Compl. ¶ 15.) Goodloe also noted a new lease agreement for the Business Executive Package—a 48 month lease requiring monthly payments of $99.95. (*Id.*) Goodloe believed that the Business Executive Package had been offered for a one-time payment of $99.99. (*Id.*) The new leases were arranged so that Axin would buy the services from NWC, ECX, and Minotola, and then lease the services to Goodloe. (Compl. Exs. 4.A, 5.A.)

In November 2001, Goodloe entered into the first lease agreement with Axin whereby Axin leased Goodloe NWC's Business Executive Package—consisting of one NWC wholesale electronics dealership, credit card processing software and a website. (Compl. ¶ 18.) The wholesale electronics dealership allowed Goodloe to sell consumer electronics from an NWC catalog. (Compl. Ex. 1.A at 1.) Later in November 2001, Goodloe entered into a second lease agreement with Axin whereby Axin leased to Goodloe an NWC Non-Exclusive OEM Advanced Computer Dealership for 36 months at $32.95 per month. (Compl. ¶ 19.) The OEM dealership allowed Goodloe to sell certain computer equipment that was available through NWC. Both leases provided that Axin would automatically debit Goodloe for payment each month through a bank account. (Compl. Exs. 4.A, 5.A.)

In December 2001, Goodloe received the Business Executive Package literature and fifty business cards. (Compl. ¶ 20.) Goodloe alleges that he received fewer business cards than he should have and that the cards had typographical errors on them. (*Id.*) He

also alleges that he spoke with customer service representatives of NWC and ECX about the typographical errors on various occasions and about alleged problems with an email account but these shortcomings were not corrected. (Compl. ¶ 21.) Goodloe further alleges that he complained to Defendants' website developer, Joseph Kilgannon, about Goodloe's website, but that requested changes were not made correctly. (Compl. ¶¶ 37-38, 40-42.)

After being unsatisfied with the service he was receiving, Goodloe closed his bank account so that Axin could no longer withdraw the monthly lease payments. (Compl. ¶ 40.) In February 2002, Axin's Collection Manager, Trevor Krause, informed Goodloe that it would "damage Plaintiff's credibility" if he did not immediately pay the amounts due under the lease agreements. (Compl. ¶ 44.) In May 2002, Goodloe learned that the Axin reported the past due amounts owed under the lease agreements to two credit reporting agencies. (Compl. ¶ 45.)

To recap the allegations in the complaint, Goodloe alleges that he received an offer to purchase the Business Executive Package for a one-time payment of $99.99 and to lease the OEM dealership for 24 months at $24.95 per month. The Defendants, after learning Goodloe's income level and status as a schizophrenic, refused to offer Goodloe these prices and instead offered to lease him the Business Executive Package for 48 months at $99.95 per month and to lease him the OEM dealership for 36 months at $32.95 per month. Goodloe agreed to the amended lease terms and entered into two leases with the Defendants. The Defendants failed to perform as promised under the lease agreements. Specifically, the website created for Goodloe's business contained typographical errors, the website did not contain a separate page for the OEM dealership,

6

the business cards supplied by Defendants contained typographical errors, and Goodloe received fewer business cards than he was promised. Goodloe quickly stopped making lease payments by closing a bank account designated for automatic payments, and Axin reported the resulting delinquency to two credit reporting agencies. Goodloe alleges that Defendants conspired to ruin his business and reputation, and violated a number of federal and state statutes in doing so.

Discussion

## I. Standard of Review

When considering a motion to dismiss, the Court accepts the well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996). Goodloe's complaint must be read generously because it is a *pro se* pleading. *See Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984); *accord, e.g., Zarnes v. Rhodes*, 64 F.3d 285, 289 (7th Cir. 1995). However, a "complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Palda v. Gen. Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995).

## II. Federal Question Claims

Counts I-VIII and XV-XVII of Plaintiff's Complaint claim relief based on various federal statutes. (Compl. ¶¶ 48, 54, 59, 63, 66, 69, 74, 78, 101, 104, 107.) This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331. As explained below, these claims suffer from a number of fundamental defects. The Court highlights some below.

A. Counts I-II, Sherman Act Claims[1]

Count I alleges that the Defendants conspired to restrain trade (through some measure of vaguely defined market power) in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. (Compl. ¶¶ 48, 49.) Specifically, Goodloe alleges that the Defendants used their "monopoly power and/or market power and/or economic power" to force him to purchase their services at an inflated cost and on unfavorable terms. (Compl. ¶ 50; *see also id.* ¶ 48 (alleging that Defendants forced and coerced contracts and agreements with Plaintiff).) Count II alleges that the Defendants "combined and agreed to monopolize the price of Plaintiffs' [sic] wholesale products and services different from those in the public market," in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. (Compl. ¶ 54.) Both of Plaintiff's Sherman Act claims are defective.

Turning first to Plaintiff's monopolization claim under § 2, the Sherman Act provides that:

> [e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . .

15 U.S.C. § 2. To show a monopoly under § 2 of the Sherman Act, Plaintiff must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as

---

[1] Although not addressed in Plaintiff's Complaint, the Court assumes that Plaintiff, as a private actor, seeks to adjudicate his Sherman Act antitrust claims pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. *See Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.3d 1409, 1419 (7th Cir. 1989) (holding that mere presence of Sherman Act violations "does not by itself bestow on any plaintiff a private right of action for damages. That is the gift of section 4 of the Clayton Act").

a consequence of a superior product, business acumen, or historic accident." *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (citing, *inter alia, Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 481 (1992)). The Supreme Court has held that monopoly power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). The relevant market is defined as "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Co.*, 365 U.S. 321, 327 (1961). The plaintiff must define the relevant market that the defendant is attempting to monopolize in order to prove the elements of monopoly. *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 534 (4th Cir. 2003) (citing *Spectrum Sports v. McQuillan*, 506 U.S. 447, 455 (1993)). Additionally, to survive a motion to dismiss, a complaint must allege facts sufficient to create an inference that the defendant has the market power to create a monopoly. *See Endsley*, 230 F.3d at 282 (collecting cases).

Plaintiff's monopolization claim is doomed for at least two reasons. First, Plaintiff has not, as he must, properly defined any market that Defendants might conceivably be said to have monopolized or conspired to monopolize. The closest Plaintiff comes to a proposed market is "the Wholesale Market" (Compl. ¶ 56) which is presumably a reference to the wholesale electronics market, as NWC was to make available various electronics goods to Goodloe on a wholesale basis. Putting aside the fact that Plaintiff does not allege that he actually bought any wholesale electronics from any Defendant in the few weeks between the time he signed the leases and terminated his relationship with Defendants, this market cannot suffice because most of the Defendants do not even sell wholesale electronics of any kind. Instead, they provide web

9

development services, internet storefront services, and small-time credit lines. Second, even if one were to ignore this issue, there are no allegations in the Complaint (and none would seem to be possibly maintained) that any of these Defendants have market power, much less monopoly power, in any economic market. There are serious players in the wholesale electronics market (*e.g.*, Sony, Sanyo, Panasonic, and many, many others) and these Defendants (no disrespect intended) would seem to be fringe players at best in terms of market power. There are also no allegations—and none would seem possible—that Defendants have monopolistic or even material market power in any other line of business. Under such circumstances, where a plaintiff fails "to identify any facts from which the court can 'infer that defendants had sufficient market power to have been able to create a monopoly,'" a § 2 claim should be dismissed. *Endsley*, 230 F.3d at 282 (collecting Seventh Circuit precedent).

Plaintiff's vague allegation that Defendants conspired to monopolize in violation of § 2 fares no better. To prove a conspiracy to monopolize, Plaintiff must show: 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce, and 4) the existence of specific intent to monopolize. *The Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541-42 (7th Cir. 1986) (footnote omitted).

Rather than alleging even minimal facts to support his vague allegation of a § 2 conspiracy, Plaintiff has simply parroted the language of § 2 itself in his averment that Defendants "combined and agreed to monopolize." (Compl. ¶ 54.) Plaintiff also alleges that Defendants "effectuated [their conspiracy] by the means and overt acts set forth above, among others." (*Id.* ¶ 55.) Plaintiff's sole factual explication of his conclusory

assertion is that Defendants intended to "increase, or supersede and/or foreclose the cost for Plaintiffs to own and operate an ordinary priced small business"; "injure and eliminate Plaintiffs from gainfully competing in the Wholesale Market"; and "inordinately control the price and supply of Plaintiff's wholesale merchandise." (*Id.* ¶ 56.)

Seventh Circuit precedent teaches that, in the context of a Rule 12(b)(6) challenge to a Sherman Act claim, the court must evaluate whether (accepting all factual allegations as true) "the plaintiff[] has successfully pleaded a . . . conspiracy in restraint of trade within the meaning of the Sherman Act." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984). Precedent further instructs, however, that the plaintiff "may not evade these requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiff[] will get nowhere merely by dressing them up in the language of antitrust." *Id.* (internal quotation marks and citation omitted).

Plaintiff's "conspiracy to monopolize" claim fails on this basis. Plaintiff's complaint merely adopts boilerplate language from § 2 and offers only his own legal conclusions unadorned by pertinent factual allegations. This is not adequate to state a claim that Defendants conspired to monopolize in violation of § 2. *See Car Carriers*, 745 F.2d at 1110 ("[I]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by supporting factual allegations . . . [but plaintiff] provide[s] no more than a legal conclusion."); *accord Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980) ("We are simply unwilling to construe pleadings so liberally as to imply a

11

comprehensive scheme to monopolize . . . where the only mention of such a 'conspiracy' in the complaint is the naked statement that one exists."). Moreover, as discussed above, most of Defendants are not players in the wholesale market that appears to be at issue here. *See, e.g., Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1262 n.4 (11th Cir. 1998) ("Equally fatal to [plaintiff's] conspiracy allegation is the fact that no authority exists holding a defendant can conspire to monopolize a market in which it does not compete.").

Turning to Plaintiff's § 1 claim, it is somewhat difficult to discern Plaintiff's precise allegations, but it seems that he believes the Defendants used their "monopoly power and/or market power and/or economic power" to force and coerce Goodloe into paying a higher price on the leases than he initially was quoted. (Compl. ¶¶ 48, 50.) Further, after Goodloe agreed to contract for the leases and services, Defendants did not correct typographical and similar errors concerning Goodloe's website and business cards. In essence, Plaintiff appears to contend that Defendants conspired to hurt Goodloe (that is, Defendants' client) alone as compared to Goodloe's putative competitors in the e-commerce arena.

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Though Plaintiff's allegations are not clear, his claim appears to be multiply flawed. First, there are no allegations, nor any reason to believe, that Defendants have any market power. Even in the internet services market (where most Defendants are involved), the barriers to market entry are typically *de minimis*, such that scores of individuals (including high school and college students

12

who advertise all over the internet) can enter and help people develop websites for a fee. This lack of market power bodes ill for Plaintiff's claim as framed. *See, e.g., 42nd Parallel North v. E St. Denim Co.*, 286 F.3d 401, 405 (7th Cir. 2002) ("[T]his circuit has adopted a threshold requirement . . . that the plaintiff needs to show that the defendant has market power."); *see also The Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 537 (7th Cir. 1986) (discussing § 1 claims in which showing of market power is necessary element). Although there are some § 1 violations where a showing of market power is not a prerequisite (*e.g.*, horizontal price fixing between actors in the same market), Goodloe's Complaint does not appear to implicate these sorts of *per se* concerns. Instead, Goodloe alleges that Defendants harmed him by providing him alone bad services and charging him alone more than Defendants might have charged other unidentified putative competitors. This counterintuitive "conspiracy" of the Defendants—to harm their client, to the benefit of all others, including non-clients—would not seem to implicate the antitrust laws, which, as has been repeatedly said, exist to protect competition generally and not single putative competitors. *See, e.g., Midwest Gas Servs., Inc. v. Indiana Gas Co., Inc.*, 317 F.3d 703, 711 (7th Cir. 2003) (collecting Supreme Court precedent); *see also 42nd Parallel North*, 286 F.3d at 405 (stating that "it is the function of § 1 to compensate the unfortunate only when their demise is accompanied by a generalized injury to the market") (internal quotation and citation omitted); *Indiana Grocery, Inc. v. SuperValue Stores, Inc.*, 864 F.2d 1409, 1418-19 (7th Cir. 1989) (courts must analyze § 1 claims to form judgment about competitive significance of alleged restraint); *Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee*, 624 F.2d 798, 811 (7th Cir. 1980) (stating that "[t]he Sherman Act requires

more than mere injury to a competitor. Plaintiffs must show also that the 'effect upon competition in the marketplace is substantially adverse.'") (citation omitted).

In addition, the Seventh Circuit has stated that for a plaintiff to state a claim under § 1, the plaintiff must show, *inter alia*, an "unreasonable restraint of trade in the relevant market[,]" *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 448 (7th Cir. 1999), and Goodloe's inability to define a relevant economic market (as opposed to him alone) again undermines any claim. *See also George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (collecting precedent and stating that, in § 1 or § 2 cases, a plaintiff must "demonstrate, as a threshold matter, that the challenged action has an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.") (internal quotation marks and emphasis omitted).

Finally, the Court notes that Plaintiff's § 1 claim is inadequate for the same reasons his § 2 conspiracy claim fails. Plaintiff adorns his § 1 claim with antitrust terminology—"contract," "combination," and "conspiracy," for example—yet omits factual allegations that would even minimally support a § 1 claim. *See, e.g., Car Carriers*, 745 F.2d at 1106-07 ("When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery . . . . A contrary view would be tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6)."). As discussed later in the opinion, Goodloe's Complaint might possibly present certain claims actionable under state law (the Court does not undertake that evaluation today for the reasons explained later), but the Complaint does not present any actionable Sherman

Act claim. *See generally Havoco*, 626 F.2d at 559 (affirming dismissal of Sherman Act claim and agreeing with district court observation that "it is hard to ignore the suspicion that the facts have been forced into an antitrust mold to achieve federal jurisdiction"); *see also id.* (when considering motions to dismiss, "federal courts [are not required] to put on blinders when presented with state law causes of action which have been contorted into antitrust language").

For all of these reasons, Goodloe's § 1 claim is dismissed. Goodloe's complaints about the quality of his webpage, email account, and business cards, and his belief that he should have contracted for marginally lower lease terms than those he agreed to, do not appear to implicate the federal antitrust laws.

B. <u>Counts III-V, Robinson-Patman Act Claims</u>

Goodloe asserts three claims for violations of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13. First, he claims that the Defendants violated § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, by requiring him to pay higher prices than other dealers—Goodloe's competitors—for the franchises. (Compl. ¶ 59.) Second, he claims that the Defendants violated § 2(e) by offering him less desirable terms than offered to other dealers. (Compl. ¶ 63.) Finally, he alleges that the Defendants violated § 2(f) by knowingly inducing him to accept a discriminatory price for the franchises. (Compl. ¶ 66.) None of these claims survives the motion to dismiss.

Section 2(a) prohibits sellers from discriminating, in certain circumstances, in price between different purchasers in interstate sales of commodities of like grade and quality. 15 U.S.C. § 13(a). Section 2(e) prohibits sellers from discriminating, as between

different purchasers in interstate sales of commodities bought for resale, with respect to certain facilities and services. 15 U.S.C. § 13(e). Section 2(f) makes it unlawful for any person to knowingly induce or receive a discriminatory price that is prohibited by the Act. 15 U.S.C. § 13(f).

There are two types of price discrimination under § 2(a) of the Act. *See, e.g., Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1322 (7th Cir. 1991). Section 2(a) "forbids a seller to charge different prices to different purchasers of the same commodity if the effect 'may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition' with the seller himself," *id.,* so-called "primary line" discrimination. The Seventh Circuit has explained that in primary line cases, "the gravamen is that the aggressor sold goods for too little money, hoping to cripple or discipline rivals so that it might sell its wares for a monopoly price later, recouping the losses and adding a hefty profit, to the detriment of consumers." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1399 (7th Cir. 1989). The second type of price discrimination involves "secondary line" cases, where the plaintiff is a customer of the defendant charging discriminating prices, not a competitor of the defendant. *Am. Academic Suppliers*, 922 F.2d at 1322. A private plaintiff in a secondary line case must show that it suffered actual injury to its business or property as a result of the price discrimination. *George Haug Co.*, 148 F.3d at 141 (citing *J. Truett Payne, Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981)).

Goodloe's complaint alleges that his business was harmed because the Defendants charged him higher prices and offered him less favorable lease terms than those offered to his putative competitors. Therefore, Goodloe's claim is properly

16

classified as a secondary line case.[2] In order to plead price discrimination under § 2(a), Plaintiff must allege "(1) at least two sales of commodities (2) by the same seller (3) to different purchasers (4) at different prices to persons in competition with each other (5) that have an anti-competitive effect." *Kundrat v. Chicago Bd. Options Exch., Inc.*, No. 01-C-9456, 2002 WL 31017808, at *5 (N.D. Ill. Sept. 6, 2002) (citing *Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*, 550 F. Supp. 960, 966 (N.D. Ill. 1982)). Goodloe's claim must be dismissed because it alleges no facts about who his putative competitors are or the favorable prices and terms actually granted to his competitors. *See Kundrat*, 2002 WL 31017808, at *7 (dismissing a Robinson-Patman Act claim for failing to allege a second purchaser with whom plaintiffs were in competition). His sole allegation is that the Defendants' price discrimination "caused and injured Plaintiff's [sic] in the [sic] person and business, by preventing Plaintiffs from competing with persons that grant and receive the benefit of such discrimination, and other competitors and/or coconspirators similarly situated . . . ." (Compl. ¶ 60.) Because Goodloe's Robinson-Patman Act claims are no more than conclusory legal allegations, they must be dismissed for failure to state a claim upon which relief may be granted.

Even if defects in the Complaint can be overcome, it appears that the claim would still be dismissed because the facts alleged indicate that Goodloe does not have a valid claim under the Act. The Complaint does not appear to be able to state a valid cause of action because the licenses and services leased to Goodloe do not constitute

---

[2] Any notion of a primary line case further seems baseless because Defendants are not alleged, and do not appear to have, even oligopoly power, much less a hint of monopoly power in any market. *See A.A. Poultry Farms*, 881 F.2d at 1399.

17

"commodities" under the Robinson-Patman Act. The term commodities, as used by the Act, means "goods, wares, merchandise, machinery, or supplies." *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035 (7th Cir. 1989) (internal quotation marks omitted). The scope of § 2(a) is limited to tangible goods and does not include services or other intangible goods. *See Kundrat*, 2002 WL 31017808, at \*6 (citing *Baum v. Investors Diversified Servs., Inc.*, 409 F.2d 872, 875 (7th Cir. 1969)). Consistent with decisions of the Seventh Circuit and other courts, web site maintenance, an electronics retail franchise, credit card processing services, and order processing services are not "commodities" for purposes of the Robinson-Patman Act. *See generally First Comics*, 884 F.2d at 1037 (printing services provided to a comic book publisher constitute a service rather than a commodity); *Columbia Broad. Sys., Inc. v. Amana Refrigeration, Inc.*, 295 F.2d 375, 378 (7th Cir. 1961) (television broadcast time is not a commodity); *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 621 (D. Md. 2001) (newspaper advertising is not a commodity); *Kundrat*, 2002 WL 3107808, \*6 (stock options are not a commodity because they are not tangible goods); *LaSalle St. Press, Inc. v. McCormick & Henderson, Inc.*, 293 F. Supp. 1004, 1006 (N.D. Ill. 1968) (a patent license granting the right or privilege to use a particular method or process is not a commodity), *aff'd in part and rev'd in part on other grounds*, 445 F.2d 84 (7th Cir. 1971); *SCM Corp. v. Xerox Corp.*, 394 F. Supp. 384, 385 (D. Conn. 1975) (discussing the "undisputed premise that the Robinson-Patman Act does not apply to leases" and holding that photocopier equipment lease requiring user to pay a per copy charge was a lease of the copying process—*i.e.*, a service—rather than a lease of a commodity); *Credit Chequers Info. Servs., Inc. v. CBA, Inc.*, No. 98-CIV-3868, 1999 WL 253600, at \*12

18

(S.D.N.Y. Apr. 29, 1999) (credit reports are services).

The relevant caselaw shows that Plaintiff does not adequately state a Robinson-Patman claim because Plaintiff's business dealings with Defendants involved services, not commodities. For example, a website lease is comparable to a lease of television broadcast time, a franchise lease is comparable to the purchase of a patent (in that it allows the user to use an established process), and credit card and order processing services are comparable to per charge copying services because Goodloe was leasing the process. Because these are services rather than commodities, the Robinson-Patman Act is not implicated. *See First Comics, Inc.*, 884 F.2d at 1037 (rejecting § 2(a) claim where "the dominant nature of the transaction was one for services").

As for Count IV, brought under § 2(e), Plaintiff does not allege any transaction between any of the Defendants and any competitor of Goodloe; Plaintiff did not allege that he purchased any goods from the Defendants for resale, as § 2(e) requires[3]; and Plaintiff has not alleged that another actual buyer received preferential treatment in terms of facilities and services. *See generally Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1144 (5th Cir. 1992) (dismissing § 2(e) claim where plaintiff alleged that defendant failed to provide technical support in breach of contract, while defendants continued to provide technical support to plaintiff's competitors). As such, Goodloe's §2(e) claim is multiply flawed and therefore dismissed.

Count V is not a valid claim as against Defendants because § 2(f) does not apply

---

[3] *See Centex-Winston Corp. v. Edward Hines Lumber*, 447 F.2d 585, 587 (7th Cir. 1971) (stating that "Section 2(e) is directed against discriminatory treatment of purchasers engaged in the resale of the seller's goods.") (internal quotation and citation omitted).

to sellers. It only applies to buyers who knowingly induce or receive prohibited prices. *See Automatic Canteen Co. v. FTC*, 346 U.S. 61, 62 (1952). The Supreme Court has noted that § 2(f) is "roughly the counterpart, as to buyers, of sections of the Act dealing with discrimination by sellers . . . ." *Id.*, 346 U.S. at 63. Like Goodloe's other antitrust claims, Count V is dismissed.

### C. Count VI, Americans with Disabilities Act Claim

Count VI of the complaint alleges that the Defendants violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq*, with respect to Goodloe's schizophrenia. (Compl. ¶¶ 69-70.) Specifically, Goodloe bases his claim on § 12132 of the ADA, which states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

> Title II, in turn, defines "public entity" as:

> (A) any State or local government;

> (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

> (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of Title 45).

42 U.S.C.A. § 12131.

None of the Defendants meets the definition of public entity under Title II of the ADA. Each Defendant is a private corporation engaged in commercial activities. (*See* Compl. ¶ 6.) Plaintiff has not alleged facts indicating that any of the Defendants meets the definition of public entity as set forth in Title II of the ADA.

Furthermore, it does not appear that Plaintiff could assert a claim under any of the other Titles of the ADA, as the case does not arise out of an employment relationship, access to a public accommodation, or use of telecommunications services as that term is defined in the ADA. Accordingly, Count VI is dismissed.

### D. Count VII, Lanham Act Claim

Goodloe fails to state a valid claim under the Lanham Act. There are two grounds for liability under the Lanham Act: (1) false representations concerning the origin, association or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress or other devices, and (2) false representations in advertising concerning the qualities of goods or services. *See L.S. Heath & Son v. AT&T Info. Sys.*, 9 F.3d 561, 575 (7th Cir. 1993). As Goodloe made no allegations regarding misrepresentation of a trademark, this case is properly classified as a claim asserting false representations in advertising regarding the qualities of Defendants' services. To have standing to allege a false advertising claim under the Lanham Act, the plaintiff must assert a competitive injury—*i.e.*, the plaintiff must be a competitor of the defendant. *See L.S. Heath & Son*, 9 F.3d at 575 (holding that a candy manufacturer did not have standing to raise a false advertising claim against computer company concerning computer company's advertising).

Goodloe lacks standing because he is not a competitor of any of the Defendants. His business, GTM-U.Pep Club, is directed to "resale of customized computers, publications, and wholesale merchandise." (Compl. ¶ 6.) In contrast, for example, Defendant ECX is a developer of Internet businesses. (*Id.*) Defendant NWC is a computer and electronics wholesaler that sells goods to dealerships. (*Id.*) None of the

markets served by the Defendants' businesses overlaps with the markets served by Goodloe. Specifically, Goodloe is directed to the retail market for consumer electronics through sales to consumers (although Goodloe alleges no actual purchases of such electronics goods from Defendants), while NWC serves the wholesale market by selling to retailers. Because Goodloe has not alleged any facts indicating that he is a competitor of any of the Defendants, he lacks standing to bring a claim for false advertising under the Lanham Act, and Count VII is dismissed for failure to state a claim upon which relief may be granted.

### E. Count VIII, Federal Trade Commission Act Claim

Count VIII states a claim for relief based upon Defendants' alleged false advertising and deceptive practices, in violation of the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* (Compl. ¶ 78.) This claim must be dismissed because well-settled precedent teaches that a private cause of action does not exist under the Act; instead, the Federal Trade Commission has sole power to enforce the Act. *See, e.g., Morrison v. Back Yard Burgers, Inc.*, 91 F.3d 1184, 1187 (8th Cir. 1996); *Am. Airlines v. Christensen*, 967 F.2d 410, 414 (10th Cir. 1992); *Baum v. Great Western Cities, Inc., of New Mexico*, 703 F.2d 1197, 1209 (10th Cir. 1983); *Dreisbach v. Murphy*, 658 F.2d 720, 730 (9th Cir. 1981); *Fulton v. Hecht*, 580 F.2d 1243, 1248-49 n.2 (5th Cir. 1978). Accordingly, this claim is dismissed.

### F. Count XV, Truth in Lending Act Claim

Count XV alleges a violation of the Truth in Lending Act ("TILA") based on Defendants' alleged failure to sufficiently indicate the annual percentage interest rate in the lease agreements. (Compl. ¶ 101.) Defendants contend that there was interest

assessment, so the claim is not germane. (D.E. 14 at 10-11.) While that may be correct—the Court need not decide—this claim must be dismissed because the statute of limitations has tolled. TILA requires all actions to be brought within one year from the date of the occurrence of a violation. 15 U.S.C § 1640. The statute of limitations begins to run when the borrower accepts the creditor's extension of credit. *See Nash v. First Fin. Sav. & Loan Assoc.*, 703 F.2d 233, 238 (7th Cir. 1983) (collecting cases); *accord, e.g., Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 24 & n.3 (1st Cir. 1997). In the present case, the leases were executed on November 12, 2001 and November 14, 2001. (Compl. ¶¶ 18-19.) This action was filed on October 10, 2003. (D.E. 1). Thus, Goodloe's TILA claim is barred by the applicable statute of limitations.

G. Count XVI, Fair Debt Collections Practices Act Claim

Count XVI alleges that Defendants engaged in abusive, deceptive, and unfair practices in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* (Compl. ¶ 104.) Count XVI fails to state a valid claim for at least two reasons. First, the Fair Debt Collection Practices Act applies only to "debt collectors," defined in 15 U.S.C. § 1692(a)(6):

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business *the principal purpose of which is the collection of debts*, or who *regularly collects or attempts to collect*, directly or indirectly, *debts owed or due or asserted to be owed or due another.*

*Id.* (emphases added). Goodloe has not alleged, nor does the record suggest, that the principal purpose of any of the Defendants' businesses is the collection of debts or that they regularly collect the debts owed to another. Instead, the allegations appear to indicate clearly that the Defendants' businesses are principally directed to other pursuits.

Because Goodloe fails to assert any facts indicating that Defendants are "debt collectors" within the meaning of the FDCPA, the claim must be dismissed. *See Arnold v. Truemper,* 833 F. Supp. 678, 686 (N.D. Ill. 1993) (dismissing claim brought under FDCPA because plaintiff failed to allege facts placing the defendants within the scope of definitions of the FDCPA).

Second, Goodloe fails to allege that the Defendants' purported threats were made to collect a "debt" within the meaning of the FDCPA. "Debt" is defined by § 1692(a) of the FDCPA as:

> any obligation or alleged obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are *the subject of the transaction are primarily for personal, family, or household purposes,* whether or not such obligation has been reduced to judgment.

*Id.* (emphasis added). The debt arose from Goodloe's lease of a consumer electronics and computer franchise and the related processing services. The Defendants argue that this claim should be dismissed because the debt did not arise out of personal, family or household purposes under the definition of the FDCPA. (Def. Motion ¶ 23(a).) This Court agrees with the Defendants, because, again, Goodloe has failed to allege facts indicating that the debt is subject to the FDCPA and those facts he does allege make clear that the debt related to a business arrangement. *See Arnold,* 833 F. Supp. at 686. Accordingly, Count XVI is dismissed.

    H. Count XVII, RICO Claim

Count XVII alleges that Defendants violated the RICO statute by devising a plan to receive "unlawful" income and "viciously threaten[ing] collection of an unlawful debt." (Compl. ¶ 109.) Plaintiff refers to the alleged pattern in vague and conclusory

terms; there are no allegations of specific racketeering activities in his Complaint, nor does the Complaint identify proposed violations of law that can ground the allegation of a RICO predicate. In reviewing Goodloe's complaint, it should be noted that Fed. R. Civ. P. 9(b)—requiring that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity"—applies to RICO claims. *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 782 (7th Cir. 1999). In order to survive dismissal on a Rule 12(b)(6) motion, the complaint must state the "who, what, when, and where of the alleged fraud." *Id.*

While Goodloe does not declare which section of the RICO statute is applicable, § 1962(c) maps most closely to the complaint. Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). A plaintiff alleging a violation of § 1962(c) must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994). A pattern of racketeering consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Goodloe has failed to allege any predicate acts of racketeering, let alone meet the heightened pleading standard for RICO plaintiffs. This is inadequate. *See, e.g., Lachmund*, 191 F.3d at 784. Because the complaint does not allege any of the elements discussed in *Vicom* with the requisite level of specificity, Count XVII is dismissed for failure to state a claim upon which relief can be granted.

Although this claim is dismissed for lack of specificity, it appears unlikely that

25

Goodloe could properly plead a RICO claim given the facts disclosed in the record. The facts set forth in the record do not provide evidence that the Defendants are engaged in a criminal enterprise. In *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 632 (7th Cir. 1999), the Seventh Circuit noted that two complaints by dissatisfied customers of a furniture store did not add up to a pattern. It went on to add that:

> A criminal enterprise, as distinct from a normal enterprise that gets in trouble with the law from time to time, is an enterprise that *habitually* resorts to illegal methods of doing business. It is an enterprise whose disposition, whose bent, is criminal—as shown by its illegal acts' composing a pattern from which such a disposition can be inferred, in much the same way that an individual's generous disposition is inferred from a pattern of generous acts, acts frequent enough and similar enough to enable such an inference.

*Id.* at 633 (emphasis in original).

Goodloe has failed to allege any facts indicating that the Defendants are engaged in maintaining an enterprise that habitually resorts to illegal methods of doing business. At best, Goodloe's complaint alleges that Defendants engaged in improper activities towards him. Absent a showing that this is the Defendants' normal mode of doing business, this does not appear to be evidence of a criminal enterprise within the meaning of the Seventh Circuit's teaching in *Pizzo*. Accordingly, Plaintiff's RICO claim is dismissed.

III. State Law Claims

Goodloe also alleges a number of state law claims. Some appear clearly to be frivolous, others might conceivably survive a motion to dismiss, although that is by no means certain. The question, however, is whether this Court is the appropriate tribunal to make that determination or whether the claims more appropriately should be evaluated

by the state courts of Illinois.

The Seventh Circuit has taught that "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Given the interest of the State of Illinois in interpreting the law relating to Plaintiff's claims, including in particular Illinois consumer protection statutes, this Court would certainly be inclined to follow the "usual practice" outlined by the Seventh Circuit and dismiss Goodloe's state law claims without prejudice so that he could pursue them, if he so chose, in state court.

A complicating factor exists, however, because Goodloe also alleges that there is jurisdiction over his state law theories by virtue of diversity of the parties. (Compl. ¶ 5.) The exercise of subject matter jurisdiction is mandatory, not discretionary. *See Adkins v. Illinois Cent. R.R. Co.*, 326 F.3d 828, 850-51 (7th Cir. 2003). As a result, the Court must determine whether it has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

Goodleo's Complaint alleges complete diversity between the parties. It also alleges that Goodloe suffered at least $13 million in damages (and perhaps millions of dollars more in damages).

While these damages allegations are in excess of the amount-in-controversy threshold of $75,000, the problem is that the damages allegations appear to have no grounding in fact or law. Goodloe appears to have only paid, at most, several hundred dollars to Defendants under the leases in question; the total amount of the leases (including the unpaid amounts for which Goodloe is at least theoretically liable) is some six thousand dollars.

27

A court "is not free to accept unquestioningly . . . a complaint's assertion of the amount in controversy simply on the basis of [a] plaintiff's self-selected *ad damnum*." *ABC Int'l Traders, Inc. v. Beverly Bank-Matteson*, 688 F. Supp. 404, 407 (N.D. Ill. 1988) (citing *Ross v. Inter-Ocean Ins. Co.*, 693 F.2d 659, 660 (7th Cir. 1982)). Where it is obvious that even if a plaintiff can establish liability he cannot obtain a judgment for more than $75,000, exclusive of interest and costs, then diversity jurisdiction does not obtain. *See Ross*, 693 F.2d at 663 (holding that removal was inappropriate when it was obvious to the defendant that the plaintiff could not recover an amount in excess of the amount in controversy requirement), *overruled on other grounds by Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955 (7th Cir. 1998); *see also ABC Int'l Traders*, 688 F. Supp. at 407 (holding *Ross* requires a "'reasonable possibility'" that the plaintiff can recover more than the amount in controversy requirement) (quoting *Ross*, 693 F.2d at 663). Granting jurisdiction whenever the complaint asks for more than $75,000 would "invite collusive invocations of federal jurisdiction," *Ross*, 693 F.2d at 661, which is not allowed. *Id.* Further, under *Bell v. Hood*, 327 U.S. 678, 682-83 (1946), a court must not consider a claim for jurisdiction purposes when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."

It is hard to see how Goodloe has any colorable claim to damages in excess of $75,000. As stated, at most he has paid several hundred dollars under the leases. The figure actually may be no more than $132. The lease commitments involved in the case involve some $6,000. To be sure, Plaintiff asks for at least ten million dollars in punitive damages, but, as the Seventh Circuit has instructed, Illinois courts "take a rather dim

view" of punitive damages within Illinois law. *AMPAT/Midwest, Inc. v. Illinois Tool Works*, 896 F.2d 1035, 1043 (7th Cir. 1990). Moreover, Illinois courts insist that plaintiffs seeking punitive damages establish "not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness." *Europlast Ltd. v. Oak Switch Sys, Inc.*, 10 F.3d 1266, 1276 (7th Cir. 1993) (citations omitted). In this regard, deceit alone cannot support an award of punitive damages. *Europlast Ltd.*, 10 F.3d at 1276. While Goodloe alleges that the Defendants engaged in intentional unlawful conduct towards him, intentional conduct alone is insufficient to support punitive damages under Illinois law. *See Anthony v. Sec. Pacific Fin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996) (citing, *inter alia*, *Loitz v. Remington Arms,* 563 N.E.2d 397, 402 (Ill. 1990) (punitive "damages can be awarded only for . . . conduct involving some element of outrage similar to that usually found in crime.")). Moreover, the Supreme Court has held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto Ins. v. Campbell*, 538 U.S. 408, 425 (2003); *accord, e.g., Smith v. Am. Gen. Life & Accident Ins. Co.*, 337 F.3d 888, 894 (7th Cir. 2003) (stating that *State Farm* reinforces the view that courts must take a realistic look at the size of punitive damages demanded in jurisdictional context); *Anthony*, 75 F.3d at 315 (teaching that "when a claim for punitive damages" would make up "the bulk of the amount in controversy . . . we should scrutinize that claim closely"). *Smith* further teaches that "[w]hen a federal court is convinced to a legal certainty that punitive damages that form a necessary component of the amount-in-controversy requirement cannot be obtained, the court must dismiss the case for want of jurisdiction." *Smith*, 337

F.3d 894.

The parties are respectfully directed to submit briefs, of no more than ten pages in length, addressing the issue of whether this Court should dismiss the state law claims without prejudice—because the case cannot possibly involve (and never has possibly involved) more than $75,000 in terms of the amount in controversy—so that Plaintiff can pursue such claims, if he chooses, in state court. The parties are invited to brief any issue they believe are relevant to the assessment of whether or not jurisdiction is proper.

IV. Conclusion

For the foregoing reasons, the Court dismisses all of the federal claims (Counts I-VIII and XV-XVII). The parties are requested to file briefs concerning the propriety of this Court's continuing jurisdiction, as discussed above, within 21 days of the date of this Order. Furthermore, should Plaintiff choose, he is free to file an amended complaint reasserting any federal claims. Such an amended complaint also should be filed within 21 days of this Order.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated: **7-16-04**